**F I L E D**

**UNITED STATES COURT OF APPEALS**

**April 9, 2007**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GALEN RENEE BEACH,

    Defendant - Appellant.

Nos. 05-3362, 06-3053
(D. Ct. No. 05-CR-10056-MLB)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Circuit Judge, **BALDOCK**, and **LUCERO**, Circuit Judges.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Following a jury trial, Defendant-Appellant Galen Renee Beach was convicted of two counts of mail fraud and one count of making a false claim on his bankruptcy petition. On appeal, Mr. Beach challenges the sufficiency of the evidence supporting

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

each of the three counts on which he was convicted.  We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I.  BACKGROUND

On September 14, 2001, Galen and Vickie Beach submitted a pro se Chapter 7 bankruptcy petition to the United States Bankruptcy Court, District of Kansas, seeking to discharge over $100,000 in unsecured debt.  The next day, the court clerk's office contacted the Beaches to notify them of several deficiencies in their petition, including their failure to provide social security numbers and several of the required schedules.  On September 17, 2001, the Beaches filed a revised petition that included, according to the testimony of FBI Special Agent Randy Wolverton, what appeared to be intentionally transposed social security numbers.  Specifically, Mrs. Beach's social security number was reversed exactly, and Mr. Beach's social security number was reversed with the exception of one number.  The court did not immediately discover the incorrect social security numbers; hence, on September 18, 2001, the court published the typical notice of bankruptcy with the false social security numbers and sent this inaccurate notice to the creditors listed on the Beaches' petition.  The clerk's office soon discovered that the social security numbers were incorrect and contacted the Beaches to alert them to the deficiency in their filing.  On September 24, 2001, the Beaches filed an "amended" bankruptcy petition that included correct social security numbers.  About thirty days after the filing of the "amended" petition, the bankruptcy court held a meeting of the creditors affected by the Beaches' bankruptcy, and about sixty days later, the court granted a

discharge of debt in the Beaches' case.

At the beginning of 2002, J. Michael Morris, the court-assigned bankruptcy trustee, who was responsible for gathering the Beaches' non-exempt property for liquidation and distribution to their creditors, sent a standard form letter to the Beaches requesting copies of their tax return for 2001. In response, the Beaches sent Mr. Morris a letter declining to provide the tax return. This letter was the beginning of a series of letters, sent via certified mail through the U.S. Postal Service, ultimately resulting in a demand for payment by Mr. Morris to the Beaches of $500,000. Included in the trial record are letters from the Beaches to Mr. Morris and from a notary public on behalf of the Beaches to Mr. Morris. These letters demand that Mr. Morris provide the Beaches an "accounting" of some kind, notify Mr. Morris that he is failing to comply with their demands, provide a "Notice of Dishonor" for Mr. Morris's failure to respond to the Beaches' "presentment," inform Mr. Morris that he is in "default" for failure to respond to the Beaches, and issue a "Certificate of Protest" against Mr. Morris.

Ultimately, on April 17, 2003, the Beaches sent Mr. Morris a document signed by both Galen and Vickie Beach indicating that they were "attempting to negotiate a private settlement" with Mr. Morris for his alleged wrongdoing toward them, claiming that he owed them $500,000, and stating that if he did not pay them within ten days of the postmark on the letter, they would file a UCC-1 financing statement[1] showing Mr. Morris

---

[1] A UCC-1 financing statement is a method of giving notice of the existence of a security interest created by a security agreement. BLACK'S LAW DICTIONARY 568 (5th ed. 1979). The statement is filed with the Secretary of State and thus becomes public

as the debtor in the amount of $500,000.  On July 10, 2003, the Beaches filed a UCC-1

financing statement naming Mr. Morris as the debtor.  The statement was based on an

"order" the Beaches had obtained from the "Western Arbitration Council" in Utah, which

concluded that Mr. Morris's failure to respond to the Beaches' notice of arbitration before

that body resulted in a $1.5 million arbitration "award" to be paid by Mr. Morris to the

Beaches.  The Kansas Secretary of State's office processed the UCC filing in accordance

with normal procedure, resulting in the mailing of the original financing statement back to

the Beaches.

On August 27, 2003, the Beaches sent Mr. Morris one more certified letter

demanding payment of the supposed $500,000 debt.  This letter told Mr. Morris that if he

failed to pay the demand, the Beaches would take "legal action including, but not limited

to[,] involuntary bankruptcy and/or notifying the United States Trustee of this unpaid

security debt."

The Beaches then attempted to follow through with this threat and mailed a bond

claim to Liberty Mutual Insurance Company ("Liberty Mutual"), the bonding company of

the U.S. Trustee's office.  Attached to the claim was the arbitration "order" from the

"Western Arbitration Council."  Liberty Mutual processed the bond claim in accordance

---

record.  *Id.*  A financing statement does not itself create a security interest; rather, the
purpose of a financing statement "is to put third parties—usually prospective buyers or
lenders—on notice that there may be an enforceable security interest" in the debtor's
property.  *In re Biloxi Casino Belle, Inc.*, 368 F.3d 491, 499 (5th Cir. 2004).

with normal procedure and ultimately rejected the claim.[2]

The Beaches were indicted on one count of mail fraud in connection with attempting to collect the $500,000 "award" from Mr. Morris directly (Count One); one count of mail fraud in connection with attempting to collect $500,720 from Liberty Mutual against the U.S. Trustee's bond (Count Two); and one count of making a false declaration on a bankruptcy petition (Count Three). Mrs. Beach pleaded guilty pursuant to a plea agreement. Mr. Beach had a jury trial, resulting in a guilty verdict on all three counts.

## II. DISCUSSION

Mr. Beach challenges the sufficiency of the evidence as to each of the three counts of his conviction. We review sufficiency of the evidence claims de novo. *United States v. Michel*, 446 F.3d 1122, 1127 (10th Cir. 2006). "In doing so, we view the evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty of the crime beyond a reasonable doubt." *Id.* (quotation omitted). "We do not weigh conflicting evidence or second-guess the fact-finding decisions of the jury, but instead must determine whether based on the direct and

---

[2]At trial, FBI Special Agent Wolverton, a certified public accountant, testified that he had reviewed the various documents the Beaches had mailed to Mr. Morris, the bankruptcy court, and Liberty Mutual, as well as those associated with the "Western Arbitration Council," and determined they had no legal significance. Special Agent Wolverton also investigated whether there was any legal basis for the $500,000 claim by the Beaches against Mr. Morris or for the "Western Arbitration Council" arbitration "award" and determined there was none. Indeed, at a bankruptcy hearing on September 17, 2003, Mr. Beach testified that he did not "have documentation" to support the $500,000 claim.

circumstantial evidence, together with the reasonable inferences to be drawn therefrom," sufficient evidence supports the jury's verdict. *Id.* (internal citations and quotations omitted).

A.    Mail Fraud

"To establish guilt under the mail-fraud statute, 18 U.S.C. § 1341, the government [has] to prove that (1) [the defendant] engaged in a scheme or artifice to defraud or to obtain money by means of false and fraudulent pretenses; (2) he did so with the intent to defraud; and (3) he used the United States mails to facilitate that scheme." *United States v. Chavis*, 461 F.3d 1201, 1207 (10th Cir. 2006) (quotations and alterations omitted). The government must also prove materiality as an element of the crime. *Neder v. United States*, 527 U.S. 1, 25 (1999). A statement made as part of the scheme to defraud is material "if it has a natural tendency to influence, or is capable of influencing, the decision or action" of the person or entity to whom it is addressed. *United States v. Lawrence*, 405 F.3d 888, 899 (10th Cir. 2005).

1.  Count One

Count One charges Mr. Beach with mail fraud based upon the letters directed to Mr. Morris demanding payment of $500,000. Mr. Beach claims there is insufficient evidence to prove that he used the U.S. mail in connection with this scheme and to show that the fraudulent demands fulfill the materiality requirement.

Mr. Beach first asserts that the Government's evidence as to this count is insufficient because the testimony of the representative of the Secretary of State's office,

to which the UCC-1 financing statement was sent, indicated that there was no way to determine whether the UCC filing was submitted by hand in Topeka or sent via U.S. mail. Thus, there is no proof, Mr. Beach argues, that he used the U.S. mail to facilitate the alleged fraudulent scheme. But the fact that the Secretary of State cannot verify whether the Beaches sent the UCC financing statement through the mail is irrelevant for two reasons. First, even if the Beaches had hand-delivered the UCC statement, the fact that the Secretary of State used the mail in the normal course of processing the statement to return a copy of the filed statement to the Beaches for their records is sufficient evidence that Mr. Beach "used the United States mails to facilitate" his scheme. *Chavis*, 461 F.3d at 1207. "[I]t is not necessary that . . . the participants in the fraud specifically intended that the mails be used. It is sufficient if the mails were *in fact* used to carry out the scheme and if the use of the mails by a participant *or another* was reasonably foreseeable." *United States v. Curtis*, 537 F.2d 1091, 1095 (10th Cir. 1976) (emphasis added). Moreover, the use of the mails need not be an essential element of the scheme. It is sufficient if the mailing is incidental to the scheme or a step in the plot. *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989).

Second, the possibility that the Beaches did not mail the UCC-1 statement is irrelevant because the statement is not the only mailing involved in the scheme to defraud Mr. Morris. The Beaches sent multiple letters directly to Mr. Morris demanding payment of the "arbitration award" and threatening to put Mr. Morris into involuntary bankruptcy and to notify the U.S. Trustee of his "unpaid security debt." These letters included

- 7 -

notarized signatures from Mr. Beach. Thus, there is sufficient evidence in the record for a reasonable jury to conclude that Mr. Beach in fact used, and could reasonably foresee that others would use, the U.S. mail in the course of his scheme to defraud Mr. Morris.

Finally, Mr. Beach argues that the UCC filing does not fulfill the "materiality" element of the mail fraud charge with respect to Count One because there is no evidence that the UCC filing resulted in any injury or damage to Mr. Morris. To support his argument, Mr. Beach points to Mr. Morris's testimony that he was unaware whether the UCC filing caused him any actual financial damage. This argument ignores the law. Successful completion of the scheme to defraud is not an element of the mail fraud offense. *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989). Thus, "the government does not have to prove actual reliance upon the defendant's misrepresentations nor do they have to prove that the victim suffered actual pecuniary losses from the scheme." *Id.* Consequently, Mr. Morris's testimony that he was unaware of any direct damages against him does not undermine the jury's finding that Mr. Beach's conduct violated the mail fraud statute.[3]

2. Count Two

Count Two of the indictment charged Mr. Beach with mail fraud for the scheme to

---

[3]Mr. Beach also appears to argue that the UCC-1 statement cannot be a basis for mail fraud because the statement is not a "legal document." This fact is irrelevant to the jury's finding of guilt for two reasons. First, nothing in the mail fraud statute requires that the defendant use legal documents to perpetrate the scheme to defraud. *See* 18 U.S.C. § 1341. And second, as noted above, the UCC-1 statement is not the only document by which Mr. Beach attempted to defraud Mr. Morris.

defraud Liberty Mutual. Mr. Beach argues there is insufficient evidence to support his conviction because the demand letter sent to Liberty Mutual bears only Mrs. Beach's signature. Essentially, Mr. Beach argues there is no evidence *he* used the mails to facilitate the fraud. To the contrary, the record contains sufficient evidence for a reasonable jury to find that Mr. Beach used, or could foresee that others would use, the mails in this scheme to defraud. The letter to Liberty Mutual makes a claim on behalf of both Mr. and Mrs. Beach. The letter states that "pursuant to attach [sic] arbitration award Galen and Vickie Beach make a claim against the bond of J. Michael Morris." Moreover, the attached arbitration "award" from the "Western Arbitration Council" refers to the "claimants," rather than a single claimant, and includes the names of both Mr. and Mrs. Beach. In addition, the documents submitted to the "Western Arbitration Council" in order to obtain the "arbitration award" bear Mr. Beach's signature. Circumstantial evidence thus supports a reasonable jury's conclusion that Mr. Beach participated in the efforts to defraud Liberty Mutual and that he used, or could foresee that others would use, the mails as part of that scheme.

Mr. Beach also argues that there is no evidence to support the materiality requirement on Count Two because Liberty Mutual determined the claim was invalid, and neither Liberty Mutual nor Mr. Morris suffered any damages. The law does not support this argument. As previously explained, neither successful completion of the scheme to defraud nor pecuniary damage to the victim of the fraud is required to find materiality. *See Stewart*, 872 F.2d at 960.

B.    Bankruptcy Fraud

Mr. Beach was convicted under 18 U.S.C. § 152(3) for "knowingly and fraudulently mak[ing] a false declaration" relating to a bankruptcy. The basis for the charge was the filing of the Beaches' Chapter 7 bankruptcy petition with false social security numbers. The Government's evidence in support of the charge included the initial bankruptcy petition submitted without social security numbers and the filed petition with the transposed social security numbers. Mr. Beach signed both petitions, attesting that the information in the petitions was true and correct. Special Agent Wolverton testified that the manner in which the social security numbers were transposed indicated that entry of the incorrect numbers was intentional. In addition, Mr. Wolverton's testimony at trial and Mr. Beach's testimony at the September 2003 bankruptcy proceeding (the partially redacted transcript of which was admitted at trial) indicated that Mr. Beach acknowledged discussing the omissions and incorrect numbers with Mrs. Beach. Mr. Beach also admitted that he knew his social security number was incorrect.[4]

_____

[4]At trial, an employee of the U.S. Bankruptcy Court testified that the bankruptcy code and rules allow for corrections and amendments to an incomplete or inaccurate petition within the first fifteen days of filing. A Chapter 7 debtor is allowed to submit required schedules within fifteen days after filing the initial statement of intention with the bankruptcy court, and a debtor is generally allowed to amend the petition. *See* Fed. Rule Bankr. P. 1007(c), 1009. Mr. Beach appears to argue, without citation to any statute, bankruptcy rule, or case, that the existence of this grace period and the liberal rules for amendment excuse his conduct because the Beaches filed an amended petition with his correct social security number within fifteen days. As noted, however, the damage resulting from Mr. Beach's misrepresentation was already done because the notice of bankruptcy with the false numbers was published prior to the amendment.

Mr. Beach argues, however, that there is insufficient evidence to prove that he acted with an intent to defraud his creditors. The jury instructions state that "[t]o act with 'intent to defraud' means to act . . . for the purpose of causing some financial loss to another, or bringing about a financial gain to oneself or another, to the detriment of a third party." Mr. Beach contends that because the law permits his debt to be discharged, he could not have acted with the purpose of causing financial gain or loss to another or achieving financial gain for himself or another. Essentially, he asserts that because he may legitimately discharge the underlying debt, he does not stand to "gain," nor do his creditors stand to "lose," anything. This argument is without merit. Based on the evidence at trial, a reasonable jury could conclude that by filing the false social security numbers, Mr. Beach intended to cause financial loss to the Beaches' creditors regardless of whether the debt could be legally discharged. Mr. Beach's signature attesting that his social security number was correct led to the publishing of an inaccurate notice of bankruptcy. As a result, in addition to failing to notify the creditors whose debt he was seeking to discharge (potentially preventing them from recovering funds owed to them), Mr. Beach failed to notify potential future creditors who rely on the information provided by credit reporting agencies. As the testimony from multiple witnesses reveals, a bankruptcy notice is a public record that is of interest not only to the individual creditors, but to all the interested parties in the bankruptcy system, particularly credit bureaus and anyone who considers extending credit to Mr. Beach in the future.

Mr. Beach also argues that the evidence shows that Mrs. Beach handled the

paperwork for the bankruptcy petitions and it was Mrs. Beach that entered the transposed social security numbers. Thus, he claims, he was unaware of the error, and the Government failed to prove he acted with an intent to defraud. This argument is also meritless. As noted, Mr. Beach himself admitted discussing the social security numbers with Mrs. Beach before she omitted them from the initial petition and before she entered the incorrect numbers on the filed petition. He also knew the social security numbers were incorrect. Because intent to defraud is difficult to prove by direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom. For example, "[i]ntent to defraud may be inferred from the defendant's *misrepresentations*[ or] *knowledge of a false statement*," *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997) (emphasis added). The evidence shows that Mr. Beach was aware of the false statements in the bankruptcy petitions and that he attested to their truth despite this knowledge. The jury was free to infer from this evidence that Mr. Beach acted with intent to defraud.

In sum, in order for us to vacate Mr. Beach's conviction on appeal, he must convince us that the evidence was so lacking that no reasonable jury could have found him guilty. He has not done so. After carefully reviewing the record, we conclude that the evidence, when viewed in the light most favorable to the Government, provided a sufficient basis from which a reasonable jury could have found him guilty beyond a reasonable doubt.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge